UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
RICHARD AMERICA,                               )
                                               )
        Plaintiff,                             )
                                               )
    v.                                         )        Civil Action No. 03-1807 (PLF)
                                               )
KAREN G. MILLS,                                )
  *Administrator, Small Business Administration*,  )
                                               )
        Defendant.[1]                          )
_____)

OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

         This matter came before the Court for a three-day bench trial, which was the first

part of a bifurcated trial on plaintiff Richard America's claims against his former employer, the

United States Small Business Administration ("SBA").  Plaintiff alleges that the SBA

discriminated against him on account of his race (African-American) and retaliated against him

for complaining about such discrimination.  The parties previously entered into a settlement

agreement regarding these discrimination and retaliation claims (the "Settlement Agreement").

Plaintiff now alleges that the SBA breached the Settlement Agreement, and he therefore seeks to

have his underlying claims reinstated and tried to a jury.  The Court bifurcated the trial into two

phases, the first of which was the bench trial which addressed the question of whether the SBA

had breached the Settlement Agreement. The second phase, if necessary, will be a jury trial

regarding plaintiff's underlying discrimination and retaliation claims.

_____

        [1]      Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Administrator Karen
G. Mills has been substituted for former Administrator Steven Preston. FED. R. CIV. P. 25(d).

# I. FINDINGS OF FACT

The relevant facts in this phase of the trial relate to the creation of the Settlement Agreement, plaintiff's lack of success in finding a job following his departure from the SBA in 1997, and two sets of reference check phone calls that plaintiff alleges were made by Documented Reference Check to the SBA in 2000 and 2002.[2]  Plaintiff argues that through its employees' responses to the 2002 phone calls the SBA materially breached its contractual obligation under the Settlement Agreement to provide neutral references for plaintiff.  Upon careful consideration of the testimony of all of the witnesses and the documentary evidence admitted at trial, and making credibility findings as necessary and appropriate to resolve any material discrepancies in the testimony, the Court makes the following findings of fact.[3]

## A.  Plaintiff's Employment at the SBA

Richard America, an African-American man, began his employment at the SBA in 1980.  In 1995, he was working at a GS-14, step 10 level in the Office of Financial Assistance ("OFA") within the SBA.  At the time John Cox led the OFA.  Jane Butler was his deputy.  In the summer of 1995, Mr. America applied for a promotion to a GS-15 position.  During the

---

[2]     The following witnesses testified at trial: Richard America, Linda Oparnica (by videotaped deposition), Michael Rankin (by videotaped deposition), Jane Butler, Arnold Rosenthal, and Linda Rusche.  The Court has carefully considered all of the evidence presented by the parties at trial but does not discuss in this Opinion the evidence it ultimately found unpersuasive or immaterial to the outcome.

[3]     Counsel for the SBA moved for judgment under Rule 52 of the Federal Rules of Civil Procedure at the close of the plaintiff's case and again at the close of all of the evidence, and the Court heard argument from counsel for the parties on each occasion.  The Court reserved ruling on the first motion.  Rather than decide the motions, the Court will evaluate all of the evidence presented at trial and the relevant case law and determine whether plaintiff has proven a material breach of the Settlement Agreement by a preponderance of the evidence.

interview for that position, Mr. Cox informed plaintiff that the SBA had decided on a reorganization plan that, among other things, would include the transfer of Mr. America's current position to Kansas City.

Mr. America, who had lived in the District of Columbia area for many years, did not wish to relocate to Kansas City. He began looking for alternative employment within the SBA itself, as well as at other agencies of the federal government by way of a detail from the SBA to another agency. He testified that he was successful in obtaining requests for details from other agencies. For example, in August 1996, the Department of Agriculture requested that the SBA detail Mr. America to an office within the Agriculture Department to help strengthen Agriculture's staff capacity in rural development. See Plaintiff Exhibit ("PX") 25. The SBA denied this request, stating that Mr. America was "the only employee in the Rural Affairs Branch, and the Agency needs his services in his present capacity." See PX 26; see also PX 27 at 2-3.

Mr. America testified that he believed that managers at the SBA refused to allow this detail and others because they wanted to send him to Kansas City for discriminatory or retaliatory reasons. Mr. America also testified that in 1996 he began to suspect that SBA managers were making disparaging remarks about him and giving potential employers of agencies with whom he sought details negative reports about his performance in order to prevent him from obtaining a detail or other employment in the District of Columbia area. Mr. America admitted that he has no personal knowledge that such negative references were given, and he did not present any direct evidence that SBA managers were giving negative references about him. The Court will not credit Mr. America's unsupported suspicions, beliefs, or speculation.

In March 1997, rather than report to Kansas City, Mr. America retired from the SBA. He then filed administrative complaints of race, sex and age discrimination and retaliation against the SBA. These claims were resolved when he and the SBA entered into the Settlement Agreement in September of 1998. The relevant part of the Settlement Agreement for purposes of this trial provides:

> The Agency will remove and expunge from Complainant's Official Personnel Folder ("OPF"), and from the official and personal files of Complainant's last line supervisors in the Office of Financial Assistance ("OFA"), all documentation and references, if any, relating to his removal from the Federal Service, which would have become effective in March of 1997, and all documentation and references, if any, to any periods identified as Absent Without Leave ("AWOL") during 1996 and 1997 (such periods of AWOL will be converted to Leave Without Pay). In addition, all inquiries from prospective employers received by OFA shall be referred to and handled by the Agency's Office of Human Resources.

Joint Exhibit ("JX") 3 ¶ 6. Mr. America testified that this provision was important to him because it required the expungement of all records relating to his removal or forced retirement from the SBA and, by requiring the referral of all inquiries about him to Human Resources, it ensured that the SBA would provide neutral references to prospective employers. He stated that the assurance that references be neutral mattered to him because of his belief that the SBA had impeded his efforts to obtain details to other agencies to avoid being transferred to Kansas City and because he believed the SBA was continuing to block his attempts to find full-time employment after his departure from the agency.

After Mr. America left the SBA in March 1997, he actively sought alternative full-time employment (he also had part-time employment as an adjunct professor at the Georgetown University Business School). See PX 36 (letters sent by Mr. America to various

4

potential employers and contacts and his responses to listed job openings); PX 37 (same).[4]  After

signing the Settlement Agreement, Mr. America had a number of discussions or interviews with

potential employers, including NationsBank, Fannie Mae, and Telegent, that he felt were

positive, but the potential employers never followed up with him.  He suspected that SBA

managers were giving potential employers negative references despite the requirement of the

Settlement Agreement that they not do so.  Again, he could provide no evidence to support this

suspicion other than the fact that he could not get a job.

Mr. America admitted on cross-examination that he had not provided to

NationsBank, Fannie Mae, or Telegent the names of anyone at the SBA as references, and that he

had not told anyone at the SBA about these job prospects.  In fact, he had never listed individuals

at the SBA as references for a possible job, and he had never told anyone at the SBA about a

possible job opportunity.  He stated, however, that his experience during his search for a detail

convinced him that individuals at the SBA were attempting to block his employment.  He also

stated that he was surprised that it took him so long to find another full-time job, which

convinced him that SBA employees were providing negative references to potential employers.

The SBA's cross-examination of Mr. America made clear, however, that Mr. America had no

personal knowledge to support his suspicion that the SBA was giving negative references.  The

Court finds no basis from which to conclude that the SBA was providing negative references for

Mr. America.

---

[4]      Since 1999 or 2000, Mr. America has taught full-time at Georgetown, but his
compensation is minimal.

*B. Documented Reference Check*

In 2000, Mr. America saw an advertisement in the *Wall Street Journal* regarding reference testing companies which mentioned Documented Reference Check ("DRC"). DRC is a business that tests what kind of references employers are providing for current or former employees. The Court heard and saw videotaped testimony from Michael Rankin, the chief service officer, about DRC's practices. During his deposition, Mr. Rankin refused to answer basic questions about DRC's business, such as the number of employees it has or whether it is incorporated, on the ground that such information constituted trade secrets. One of DRC's employees, Linda Oparnica, also testified about how DRC operates. Despite Mr. Rankin's unwillingness to answer questions about the company's business practices and his general evasiveness and belligerence during his deposition, with the help of Ms. Oparnica's testimony, the Court is able to understand important aspects of how DRC operates, although the full scope of DRC's business operations still remains unclear.

Once DRC receives an application from a client to do a reference check, it is DRC's practice to mail the reference check application to an "associate," a trained court reporter employed by DRC, who conducts the reference checks. See Deposition of Linda Oparnica Gonchar ("Oparnica Dep.") at 7, 15.[5] The associates work from home, not from DRC's office, and make the phone calls from their own phone numbers. See id. at 17. They never call the client, id. at 19-20, but they do call each of the individuals listed on the application in the process of performing the reference check. Id. at 19. The associates work from a script which suggests

---

[5] Linda Oparnica described herself as a former court reporter, now a "transcriptionist." She testified that she is a certified court reporter who has been licensed since 1994. Oparnica Dep. at 9.

basic questions, such as asking about the former employee's job title, whether he or she had noteworthy projects or accomplishments, whether the employee had problems with attendance or tardiness, and whether he or she was eligible for rehire. See id. at 14-15. The associates are allowed to deviate from the script in order to make the conversation seem natural.

Ms. Oparnica testified that she would transcribe the responses to the questions on her stenograph machine while on the telephone with the reference. See Oparnica Dep. at 13, 32. It was her practice to accurately transcribe the conversations she had with references. See id. at 31-32. To complete a report she filled in blank spaces in an electronic template of a reference check report. See id. at 22. The report also included dates for attempted contact of references. See id. at 23. If Ms. Oparnica was unable to reach a listed reference after approximately ninety days, she would mail a questionnaire to the reference and indicate that she had done so in the report; sometimes the reference would respond to the questionnaire. See id. at 24-25.

Once she had completed all of the reference calls, Ms. Oparnica would save the report on a disk and mail the disk back to DRC. See Oparnica Dep. at 23-24, 89-90. The template for the report included an electronic copy of her signature after the statement "I state under penalty of perjury that the preceding reference check, as stated above, is true and correct." See JX 1 at 3; JX 2 at 6; see also Oparnica Dep. at 92-94. Upon receipt of the disk, Mr. Rankin testified that he would review the report for typos and general quality control. See Deposition of Michael Rankin ("Rankin Dep.") at 11-12. If he had concerns about the report, sometimes he would make a follow up phone call to the reference. See id. at 11. Mr. Rankin testified that he would never alter the substance of a report because only the associate who made the calls knows the facts; he (Mr. Rankin) does not. See Rankin Dep. at 12-13. Ms. Oparnica testified, however,

that because she signed the reports before sending them to Mr. Rankin, her certification of their accuracy does not account for the possibility that Mr. Rankin might have changed a report without her knowing it.  See Oparnica Dep. at 93-95.

### C.  The 2000 and 2002 DRC Reports[6]

#### 1.  The 2000 DRC Report

Mr. America first submitted an application for a reference check to DRC on August 20, 2000.  See PX 45 at 2.  He may have provided a resume to DRC along with his application, but testified that he did not provide a written narrative regarding his employment experience or regarding his suspicions that the SBA had provided or would provide negative comments about him.  In this application he listed three individuals to contact as references — Jane Butler, Linda Rusche, and Arnold Rosenthal — along with their phone numbers.  See id. The SBA argued that these individuals were not appropriate references, because none of them ever directly supervised Mr. America.  On cross-examination, Mr. America did not disagree with this assertion.  He explained, however, that he included these individuals for the following reasons: Jane Butler was a senior official at OFA and had been intimately involved in the process that led to his removal.  (John Cox, the head of OFA when Mr. America was there had since retired, and Ms. Butler was his deputy).  Ms. Rusche formally was Mr. America's direct supervisor in Kansas City, even though Mr. America had never met her or worked with her, because he had never actually moved to Kansas City.  In addition, she had been involved in the

_____

[6]     The Court previously admitted both of these documents over defendant's objection under the business records exception to the hearsay rule.  See FED. R. EVID. 803(6); see also Memorandum Opinion and Order, Dkt. No. 95 at 2-3 (Feb. 9, 2010).

events that led to his departure from the agency. Mr. Rosenthal was a senior official in OFA and was present when Mr. America was removed from the building on his last day of work.[7]

In response to this application, DRC produced a reference check report dated December 13, 2000 (the "2000 Report"). See JX 1. The 2000 Report indicates that Ms. Oparnica was the associate who made the reference check phone calls. See id. Ms. Oparnica does not specifically remember creating the 2000 Report, but the format is consistent with other DRC Reports she prepared and it has her signature on it. Oparnica Dep. at 97-118. Mr. America testified that he never had any direct contact with Ms. Oparnica, which was typical of DRC's practices. The 2000 Report is in the standard DRC format. It lists each date on which Ms. Oparnica attempted to contact one or more of the references — 38 times in total between September 2000 and December 2000. See JX 1 at 1.

According to the 2000 Report, Ms. Oparnica reached Mr. Rosenthal on the telephone on September 14, 2000. See JX 1 at 1. In response to her introductory questions, Mr. Rosenthal stated (according to the Report) that although he remembered Mr. America, Mr. America did not work for him, and he was surprised that Mr. America had listed him as a reference. See id. He did not refer Ms. Oparnica to the Human Resources Department (as required by the Settlement Agreement). See id. at 1-2. Mr. Rosenthal testified that he never spoke to Ms. Oparnica. He also testified that while he did receive a phone call from someone

---

[7]    Jane Butler testified that she never directly supervised Mr. America, never wrote performance evaluations for him, never worked with him on a project, and never made promotion decisions with respect to him. Arnold Rosenthal testified that he never supervised Mr. America, never evaluated his work or participated in performance evaluations, never worked with him, and was not involved in the decision to transfer him to Kansas City or remove him from the agency.

regarding Mr. America within a year or two after Mr. America left the SBA in 1997, he did not give a job reference in that call.

The 2000 Report also records a conversation between Ms. Oparnica and Elana Anderson on December 11, 2000.  See JX 1 at 2-3.  Ms. Anderson was Jane Butler's assistant at the time.  According to the report, Ms. Anderson called Ms. Oparnica in response to a message that Ms. Oparnica left for Ms. Butler.  See id. at 2.  Ms. Anderson mentioned that she believed that she had spoken with Ms. Oparnica before, and asked whether the call was about Mr. America.  See id.  Ms. Oparnica stated that the call was about Mr. America, that she had been trying to reach Ms. Butler, but that it appeared that Ms. Butler was not going to return her phone calls.  See id. Ms. Anderson offered to take another message for Ms. Butler, and they concluded the phone call. See id. at 3.  Ms. Oparnica never spoke to Ms. Butler.

At the conclusion of the 2000 Report is a comment that "despite leaving numerous messages for Jane Butler and Linda Rusche, no return calls were received."  The report also states that Ms. Oparnica had forwarded a written questionnaire to Ms. Butler and to Ms. Rusche.  See JX 1 at 3.  Ms. Rusche testified that she recalls receiving a telephone message from a woman calling about a reference for Mr. America in 2000, but said she did not return the call.  Ms. Butler does not recall any phone calls from Ms. Oparnica.  Ms. Oparnica signed the report on December 11, 2000.  See id.  On December 13, 2000, Mr. Rankin signed the line stating that he had reviewed the report.  See id.

Mr. America testified that upon receiving the 2000 Report, he concluded that DRC was not complying with paragraph 6 of the Settlement Agreement because the report indicated that neither Mr. Rosenthal nor Ms. Anderson referred Ms. Oparnica's call to Human

Resources.  He did not at that time bring the issue to the SBA's attention, however.

Assuming for the moment that Ms. Oparnica in fact spoke with Mr. Rosenthal and Ms. Anderson in 2000 and accurately reported these conversations in the 2000 Report, the Court finds that neither of them said anything negative about Mr. America.  Furthermore, nothing in the report records them as having said anything that could have had a negative impact on Mr. America's job prospects even if these statements had been made to an actual prospective employer.  As for Ms. Butler and Ms. Rusche, all of the evidence is consistent:  they never had a conversation with Ms. Oparnica in 2000.

### 2.  The 2002 DRC Report

In early 2002, Mr. America met with a lawyer, Elizabeth Newman, regarding his claims against the SBA.  Mr. America then hired DRC to perform a second reference check (the "2002 Report")  in April 2002.  See PX 45 at 1.  He provided the same names and phone numbers — Jane Butler, Linda Rusche, and Arnold Rosenthal — for DRC to contact.  DRC again assigned Ms. Oparnica to make these reference check calls.  As with the 2000 Report, Ms. Oparnica does not specifically recall creating the 2002 Report.  See Oparnica Dep. at 29-30.  The report Ms. Oparnica produced is similar in form to the 2000 Report.  See JX 2.  Ms. Oparnica signed the 2002 Report and dated it June 4, 2002.  See id. at 6.  Mr. Rankin signed the report, stating that he had reviewed it, on June 10, 2002.  See id

The 2002 Report indicates that Ms. Oparnica spoke with Linda Rusche on the phone on May 2, 2002.  See JX 2 at 1.  In response to Ms. Oparnica's request for a reference, the 2002 Report indicates that Ms. Rusche said:  "I was actually involved in a job transfer of his

from Washington to here, but he did not report." See id. at 1. According to the 2002 Report, Ms. Rusche also stated that Mr. America had left the agency instead of reporting to her office in Kansas City, and that she was never his supervisor. See id. Ms. Rusche told Ms. Oparnica to call the SBA office in Washington for information, and that she thought Ms. Oparnica should start with the Personnel Department. See id. Ms. Rusche testified that this conversation never took place and that she never spoke to anyone about Mr. America, stating unequivocally: "I know I did not speak to her [Ms. Oparnica]."

The 2002 Report also indicates that Ms. Oparnica spoke with Ms. Butler on June 4, 2002. See JX 2 at 4. According to the Report, Ms. Butler immediately referred Ms. Oparnica to Human Resources. See id. Ms. Butler does not recall this phone call. Ms. Oparnica also spoke with a woman in the Personnel Department who confirmed the dates of Mr. America's employment and stated that he would be eligible for rehire. See id. at 5.

Finally, the 2002 Report indicates that Ms. Oparnica spoke with Mr. Rosenthal on the phone on May 11, 2002. See JX 2 at 2. In contrast to the 2000 Report, the 2002 Report states that Mr. Rosenthal provided substantive answers to Ms. Oparnica's questions. He said of Mr. America that "[h]e was a very bright think tank-type of individual," that Mr. America worked in financial assistance, and that he ran the SCORE Program. Id. at 2. According to the 2002 Report, Mr. Rosenthal also stated that Mr. America is "a very good guy. I really think his strength is, he is a think tank-type of guy. High level thinker. He may not be the guy to take it to the next level, but he is very good about identifying ideas. He's very smart." Id. at 2-3. Mr. Rosenthal also reportedly stated that Mr. America "did get transferred to Kansas City. He took care of a rural initiative. That was a difficult experience for him. . . . I don't think he got along

with everybody the way he got along with me. There was an internal battle going on with his transfer." Id. at 3. Mr. Rosenthal at first testified that he never spoke with Ms. Oparnica, but on cross-examination, he said only that he did not remember or recall having had a phone conversation with her. Somewhat incredibly for someone who worked in a management position for so long, Mr. Rosenthal also testified that he does not remember ever giving references for former employees.

Assuming for the moment that Ms. Oparnica in fact had conversations with Ms. Rusche, Ms. Butler and Mr. Rosenthal in May and early June of 2002, and that those conversations are accurately reported in the 2002 Report, the Court makes the following findings: Ms. Butler made no statements to Ms. Oparnica and immediately referred her to Human Resources. The few statements Ms. Rusche made to Ms. Oparnica were not negative and could not have had a negative impact on Mr. America's employment prospects. She also told Ms. Oparnica to call the Personnel Department. As for Mr. Rosenthal, he did not refer Ms. Oparnica to Human Resources. According to the report, he did make substantive statements, most of which were positive or neutral, to Ms. Oparnica about Mr. America. Calling him a "very bright think tank-type of individual," a "very good guy," "very smart," a "high level thinker," and "very good about identifying ideas" are all positive statements. Mentioning the fact of his transfer to Kansas City is a neutral statement. The only negative statements related to the "internal battle" about the Kansas City transfer which was characterized as a "difficult experience" for Mr. America; the statement that "he may not be the guy to take it to the next level"; and the observation that "I don't think he got along with everybody the way he got along with me." The statements allegedly made by Mr. Rosenthal that were positive or neutral — even if some were

13

inaccurate, as Mr. America asserts — could not have had a negative impact on Mr. America's employment prospects.

### D. Reliability of the DRC Reports and Credibility of DRC Witnesses

The reliability of the two DRC Reports is hotly contested by the parties. SBA argues that Mr. Rankin had the incentive to alter the reports to create negative references in order to satisfy clients interested in pursuing litigation against former employers. DRC's public persona certainly supports such a conclusion — for example, the company's website is www.badreferences.com. In addition, Mr. Rankin's testimony is completely incredible — he made unreasonable assertions of privacy and trade secrets regarding such straightforward facts as the company's size and corporate structure. He was evasive and belligerent and displayed general contempt for the lawyers involved in the deposition. Nothing in his manner convinces the Court that he is telling the truth or that his testimony can be credited.

Nor do DRC's business practices provide assurances of accuracy and reliability in the reports' content. The reference checking industry apparently does not have industry standards or other formal quality controls. DRC's internal quality controls appear variable and not reliable. The company is not open and forthright about its business practices. DRC does not keep records beyond two or three years, nor does it have any formal record-retention policy. See Rankin Dep. at 74-75. While DRC associates transcribe the responses to the questions as they are talking to the reference, they do not contemporaneously create an audio recording of the phone calls, so there is nothing against which to check the transcription or the final report. See Rankin Dep at 73-74. Finally, Mr. Rankin is in a position to change a report without the

knowledge of the person who created the report.

Having said this, however, the Court finds Ms. Oparnica entirely credible. The Court credits her description of her typical practices on behalf of DRC and her testimony that she was confident she followed the same practices with respect to the two reports at issue in this case. And the Court credits her testimony that she would not have had any reason to falsify the reports to create a negative reference. See Oparnica Dep. at 33-34. She was paid per report, and her fee was not based on the content of the report or whether it cast the employer in a positive or negative light. See id. at 28, 35. She does not have any direct contact with clients such as Mr. America. See id. at 19-20. Nevertheless, while Ms. Oparnica's testimony is completely credible, she simply does not remember these specific reports or the conversations reflected in them. Furthermore, she acknowledged that Mr. Rankin could have changed them after she completed her work without her knowledge. As a result, she could not testify as to the accuracy of the content of the reports.

None of the SBA witnesses recall the phone calls with Ms. Oparnica having taken place, and Mr. Rosenthal and Ms. Rusche deny that they spoke to Ms. Oparnica in 2002. They point to items in the 2002 Report that call its accuracy into question. For example, Ms. Rosenthal testified that he always answered the phone "Rosenthal," not "this is Arnold," as recorded in the 2002 DRC Report. JX 2 at 2. The 2002 Report indicates that Ms. Oparnica spoke with Mr. Rosenthal on May 11, 2002, a Saturday, but Mr. Rosenthal testified that he did not work at the office on Saturdays. Ms. Rusche was not in the Kansas City office on May 2, 2002, the day she is reported to have spoken with Ms. Oparnica; she was traveling. See Defendant Exhibit 5 (travel voucher).

Other indicia in the reports suggest, however, that at least some of the reported conversations had to have occurred because the reports include significant details about the SBA and Mr. America's employment there that no one at DRC could have known without speaking to people at the SBA. These include statements concerning Mr. America's association with the SCORE Program, his involvement with the rural development program or initiative, the circumstances surrounding Mr. America's proposed transfer to Kansas City, the fact that he did not report there, the internal battle over Mr. America's proposed transfer, the name of Ms. Butler's assistant, and accurate statements about the supervisor-employee relationship between Mr. America and various of the people called. As Ms. Oparnica credibly explained:

> It would be hard to fabricate answers from people that I did not know. I mean, it is like your job. If I called up your boss, I wouldn't know what noteworthy project you have done. I can't make stuff like that up.
>
> *   *   *
>
> I would have to change my way of talking so I would pretend that I was speaking like the people, have their certain way of speaking. But honestly, there is no reason for me to have to do that.

Oparnica Dep. at 33-34.[8]

The Court finds that DRC did not manufacture the reference check reports from whole cloth. The Court finds that Ms. Oparnica made phone calls to persons at the SBA and had

---

[8]    Mr. America apparently submitted a resume along with the reference check applications, but this resume is not before the Court. The Court finds it unlikely that the resume would have included information about his proposed transfer to Kansas City or other information that would have enabled anyone at DRC to create the reference check reports without speaking to someone at the SBA. As for the assertion that some of the statements attributed to Mr. Rosenthal about the SCORE Program were inaccurate, that is not the point. The point is that Ms. Oparnica would have known nothing about the SCORE Program if she had not talked to someone at the SBA.

at least some of the conversations she reported having had.  In view of the testimony of

Ms. Butler, Ms. Rusche and Mr. Rosenthal, however, the Court cannot find by a preponderance

of the evidence that either report is a totally accurate transcription of phone calls with Ms. Butler,

Ms. Rusche and Mr. Rosenthal.[9]

## II.  CONCLUSIONS OF LAW

The issue before the Court is whether on these facts there was a material breach of

the Settlement Agreement.  That there was a breach is clear and already has been determined by

this Court.  See America v. Preston, 468 F. Supp. 2d 118, 124 (D.D.C. 2006)(the SBA "breached

the Settlement Agreement when its employees did not immediately forward DRC's telephone

calls to defendant's Human Resources Department as required by paragraph six of the Settlement

Agreement").  The question therefore is whether the breach was material because only a material

breach would permit rescission of the Settlement Agreement and reinstatement of plaintiff's

claims.  See Lutz v. U.S. Postal Service, 485 F.3d 1377, 1381 (Fed. Cir. 2007) (in order to

prevail, plaintiff must show "material non-compliance with the terms of the settlement

agreement"); Lary v. U.S. Postal Service, 472 F.3d 1363, 1367 (Fed. Cir. 2006); Thomas v. Dep't

of Housing & Urban Development, 124 F.3d 1439, 1442 (Fed. Cir. 1997); see also America v.

Preston, 468 F. Supp. 2d at 122 (settlement agreements "are in the nature of contracts").

---

[9]     It also came to light at trial that Ms. Rusche violated the Settlement Agreement because she did not destroy certain documents related to Mr. America, but instead took them home.  Ms. Rusche testified that she put the documents in her basement and never showed them to anyone.  She explained that she kept them because she had a previous experience in which documents bearing her signature had been falsified in litigation.  Despite plaintiff's argument that these facts should lead the Court to question Ms. Rusche's credibility, the Court finds that none of this is relevant to a determination of the matters at issue.

Whether a breach of contract — in this case the Settlement Agreement — is material or, conversely, whether it has been substantially performed turns on the following factors: (1) the extent to which the plaintiff was deprived of the benefit that he reasonably expected under the contract; (2) the extent to which he can be adequately compensated for the part of that benefit of which he was deprived; (3) the extent to which the party failing to perform (the defendant) has suffered forfeiture; (4) the likelihood that the defendant will cure its failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the defendant comports with standards of good faith and fair dealing. See Lary v. U.S. Postal Service, 472 F.3d at 1367; Greyhound Lines, Inc. v. Bender, 595 F. Supp. 1209, 1224 (D.D.C. 1984) (both quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)); see also America v. Preston, 468 F. Supp. 2d at 125. The standard of materiality for the purposes of deciding whether a contract was breached "is necessarily imprecise and flexible." Stone Forest Industries v. United States, 973 F.2d 1548, 1550-51 (Fed. Cir. 1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. a (1981)). A breach is material only if it "relates to a matter of vital importance," Thomas v. Dep't of Housing & Urban Development, 124 F.3d at 1442, or if it "goes to the essence [of the contract] and frustrates substantially the purpose for which the contract was agreed to by the injured party." The Cuneo Law Group, P.C. v. Joseph, 669 F. Supp. 2d 99, 109 (D.D.C. 2009) (quoting Draim v. Virtual Geosatellite Holdings, Inc., 522 F.3d 452, 454-55 (D.C. Cir. 2008)).

Plaintiff only asserts that the SBA materially breached the Settlement Agreement based on the phone calls recorded in the 2002 Report, not those reflected in the 2000 Report. See Pretrial Statement, Dkt. No. 78 at 3. The defendant argues that even if the 2002 Report accurately

reported phone calls that actually occurred, it does not establish that the SBA materially breached the Settlement Agreement. Assuming that the conversations between Ms. Oparnica and the SBA employees occurred more or less as they are recorded in the 2002 DRC Report, there are two separate questions related to materiality. The first is whether Ms. Rusche's and Mr. Rosenthal's failures immediately to refer Ms. Oparnica to the Office of Human Resources standing alone constituted material breaches of the Settlement Agreement.[10] The second question is whether the content of any of the statements made by Ms. Rusche and Mr. Rosenthal constituted material breaches of the Settlement Agreement.

With regard to the first question — whether or not the failure to refer Ms. Oparnica immediately to the Office of Human Resources was itself a material breach of the Settlement Agreement — the Court previously determined that the question of whether the breach was material should be decided by the finder of fact, and not resolved at the summary judgment stage, because it required resolution of disputed issues of material fact. See America v. Preston, 468 F. Supp. 2d at 125-26. As discussed in the Findings of Fact, *supra* at 4, the testimony at trial has helped the Court make a finding as to the purpose of paragraph 6 of the Settlement Agreement. See The Cuneo Law Group, P.C. v. Joseph, 669 F. Supp. 2d at 109-10 (examining circumstances that led to creation of a settlement agreement to determine the reason for inclusion of a particular clause). Mr. America testified that the Settlement Agreement's requirement that inquiries be referred to the Office of Human Resources was important to him to ensure that the SBA provided only neutral references about him, which assurance in turn was

---

[10] According to the 2002 Report, Ms. Butler complied with the Settlement Agreement by promptly referring Ms. Oparnica to the Office of Human Resources, so her conversation reported in that Report is not at issue.

important because of his belief that the SBA was blocking his efforts to find alternative employment both before and after he left the agency. See Findings of Fact, *supra* at 4. The "essence" of the agreement to provide neutral references therefore was that any references provided by the agency not hinder Mr. America's efforts to find employment following his departure from the SBA. See The Cuneo Law Group, P.C. v. Joseph, 669 F. Supp. 2d at 109.

Requiring the Office of Human Resources to respond to reference calls was one way of ensuring that the agency provide neutral references — the benefit Mr. America reasonably expected to receive from this provision of the Settlement Agreement — it was not an end in itself. Neither Mr. America nor any other witness testified that there was something particular about the Office of Human Resources that persuaded the parties to the contract to include it in the Settlement Agreement. The Court concludes, therefore, that the failure to refer calls to Human Resources immediately was not a material breach of the Settlement Agreement. See Stone Forest Indus., Inc. v. United States, 973 F.2d at 1550 ("Not every departure from the literal terms of a contract is sufficient to be deemed a material breach."). What may be material was whether that failure in any case led to the provision of reference information that was not neutral and prejudiced plaintiff in his search for employment.

The Court therefore will address the second question — whether the contents of any of the statements made by Mr. Rosenthal and Ms. Rusche (as recorded in the 2002 Report) constituted material breaches of the Settlement Agreement.[11] This is a closer question than the

---

[11] The SBA argues that the breach was not material because DRC was not an actual potential employer. The Court previously rejected this argument. See America v. Preston, 468 F. Supp. 2d at 124. As the Court explained: "There is no question that Ms. Rusche and Mr. Rosenthal reasonably believed that the caller from DRC was in fact a prospective employer and they still did not comply with that requirement. . . . The fact that Ms. Oparnica was not in fact a

first because Ms. Rosenthal and Ms. Rusche did respond substantively to Ms. Oparnica's questions, which the Settlement Agreement should have prevented.  To determine materiality, however, the Court is instructed to consider "the extent to which plaintiff was deprived of the benefit which he reasonably expected under the contract." Greyhound Lines, Inc. v. Bender, 595 F. Supp. at 1224; see also America v. Preston, 468 F. Supp. 2d at 125.  As the Court explained in its Findings of Fact, the statements made by Ms. Rusche to Ms. Oparnica were not negative and could not have had a prejudicial impact on Mr. America's employment prospects, even if Ms. Oparnica had been the representative of an actual potential employer.  See Findings of Fact, *supra* at 11, 13-14.  In addition, Ms. Rusche complied with the Settlement Agreement in that she ultimately told Ms. Oparnica to call the Personnel Department.

As for the negative statements reportedly made by Mr. Rosenthal, nothing he may have said could be construed as an effort to "block" Mr. America from obtaining employment elsewhere, or to have had that effect if made to a prospective employer — the real benefit which paragraph 6 of the Settlement Agreement served. Mr. Rosenthal's reference to the "difficult experience" that the "internal battle" over Mr. America's possible transfer to Kansas City was not a matter of "vital importance," Thomas v. Dep't of Housing and Urban Development, 124 F.3d at 1442, and did not "frustrate[] substantially" the purpose of the contract.  The Cuneo Law Group, P.C. v. Joseph, 669 F. Supp. 2d at 109.  Even if Mr. Rosenthal's statements that Mr. America may not have gotten along with everyone as well as he got along with Mr. Rosenthal

prospective employer, but a tester employed by America, does not preclude relief under Title VII. The Supreme Court has long recognized the value of testers with respect to civil rights claims." Id.  Because the Court has determined that the breach was not material for other reasons, it need not revisit this issue.

and that Mr. America might not be the person to "take it to the next level" could be construed as having a negative connotation to a potential employer, all of the other statements made by Mr. Rosenthal were either positive or neutral. Taken together, the Court concludes that his statements could not have prejudiced Mr. America's employment prospects, so Mr. America was not deprived of the benefit he reasonably expected under the Settlement Agreement.

This conclusion distinguishes this case from those in which a breach of a settlement agreement has been found to be material. For example, in Thomas v. Dep't of Housing & Urban Development, 124 F.3d at 1441, the court concluded that a settlement agreement with similar neutral reference requirements had been materially breached when a manager at the agency told someone inquiring about the job performance of the plaintiff that Thomas had been the subject of an Inspector General Investigation. That statement was unambiguously negative and would serve as a red flag to any prospective employer. Assuming that Mr. Rosenthal made the statements to Ms. Oparnica that have been attributed to him, they did breach the Settlement Agreement, but the breach was not material.

Finally, even if one were to conclude that some of Mr. Rosenthal's statements would have had a negative impact on a potential employer, and therefore amounted to a material breach, such a conclusion would turn on a few words that Mr. Rosenthal is reported to have said, not on the general tenor of his recorded conversation with Ms. Oparnica. The problem for plaintiff in that context is that while the Court has concluded that plaintiff has shown by a preponderance of the evidence that the conversations between Ms. Oparnica and SBA employees occurred in some form, see Findings of Fact *supra* at 14-17, it also has concluded that plaintiff has not shown that the 2002 DRC Report "is a totally accurate transcription of phone calls." Id.

at 17.  In light of the Court's doubts as to the accuracy of the 2002 DRC Report, the Court cannot conclude that the two or three conceivably negative statements attributed to Mr. Rosenthal, standing alone, are adequate to meet plaintiff's burden of proof that a material breach occurred. If even a few of Mr. Rosenthal's reported words were transcribed or reported inaccurately or perhaps were never said at all, there would be no negative connotations from his reported conversation with Ms. Oparnica.  Plaintiff simply has not shown by a preponderance of the evidence that such an inaccuracy did not occur.

### III.  CONCLUSION

The Court has concluded that plaintiff has not shown by a preponderance of the evidence that defendant materially breached the Settlement Agreement.  It therefore will not rescind the Settlement Agreement and reinstate Mr. America's claims.  Accordingly, the Court will enter judgment for the defendant.  An appropriate Order and Judgment will issue this same day.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: May 28, 2010